**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

FILED
IN CLERKS OFFICE

2007 MAR 19  P 11: 26

U.S. DISTRICT COURT
DISTRICT OF MASS

| | |
|---|---|
| JUSTIN LIGERI, ) | |
| ) | No.: _____ |
| Plaintiff, ) | |
| ) | |
| v. ) | COMPLAINT FOR DAMAGES |
| ) | |
| DOW JONES & CO. INC., ) | **07  CA 10528 WGY** |
| ROB MARGETTA, personally, ) | |
| and in his capacity as employee ) | |
| for Dow Jones & Co. Inc. ) | MAGISTRATE JUDGE Dein |
| LAUREN DALEY, personally, ) | |
| and in her capacity as employee ) | |
| for South Coast Media Group ) | |
| and/or Dow Jones & Co. Inc. ) | |
| ) | |
| Defendant. ) | **JURY TRIAL DEMANDED** |
| ) | |

COMES NOW the plaintiff, Justin Ligeri, for his complaint against defendant Dow Jones & Co., Inc., defendant Rob Margetta, and defendant Lauren Daley (collectively "Defendants") and alleges as follows:

1.  Plaintiff Justin Ligeri (hereinafter "Plaintiff") is a resident of Rehoboth,

Massachusetts at the address of 39 Wheaton Ave., Rehoboth, MA, 02769, and was so, with

minor exception, for the past 15 years.

2.  Defendant Dow Jones & Co. Inc. is a publicly traded New York corporation,

headquartered at the address of: 200 Liberty Street, New York, NY 10281, which provides its

publications, in part, through: The Standard-Times Newspaper and www.SouthCoastToday.com.

3.  Defendant Rob Margetta is a staff writer for The Standard-Times.

4.  Defendant Lauren Daley is a staff writer for The Standard-Times.

5.  Jurisdiction is conferred upon this court under 28 U.S.C. § 1331, 1343.

6. Venue is proper pursuant to 28 U.S.C. § 1391.

7 (a). On October 27, 2006. Defendants published an article in print in their newspaper, The Standard-Times, and on their websites, including www.SouthCoastToday.com and www.S-T.com, (the article's internet web address/URL is http://www.southcoasttoday.com/daily/10-06/10-27-06/03local.htm and can be found using the website's front page search as well, simply by typing in the universal word "eBay"), and potentially in other mediums not yet discovered by Plaintiff, and said article was entitled:

> *"Halloween scam reveals eBay's dark side -- dozens duped by local seller who never delivered costumes"*

by [defendant] Rob Margetta. Said article (hereinafter "ARTICLE ONE") was printed from said website and is attached to this complaint.

7(b). On December 11, 2006, Defendants published another article ((hereinafter "ARTICLE TWO") in the same mediums as ARTICLE ONE (ARTICLE TWO's internet web address/URL is http://www.southcoasttoday.com/daily/12-06/12-11-06/03local.htm and can be found by the same methods as can ARTICLE ONE), and was entitled

> *"Season decked with scams -- Police warn of online cheats over holidays"*

by [defendant] Lauren Daley (hereinafter "ARTICLE TWO").

7 (c). ARTICLE ONE and ARTICLE TWO will hereinafter be referred to as "Articles" when referenced collectively.

8 (a). ARTICLE ONE contains a multitude of false information that blatantly violates Massachusetts libel and defamation laws in almost every conceivable way possible, as well as the balance of the other 49 states' applicable libel and defamation laws in which it appears, as well as international libel and defamation laws where it appears internationally, and said article

violates U.S. federal laws, including blatantly violating U.S. federal libel laws -- as the article is entirely defamatory, and based entirely in falsehoods, with fraudulent use of sources, and deceptive writing that is further designed to defame, the article is fraudulent in its onset and throughout, and the purported facts contained within are substantially and meticulously false -- and almost unquestionably indicative of malicious intent.

8 (b).  Insomuch as every reference/allusion it makes to Plaintiff, ARTICLE TWO is a violation of the same libel and defamation laws that ARTICLE ONE is a violation of, as referenced in paragraph 8 (a) of this complaint.

9.  ARTICLE ONE contains a multitude of false statements which severely discredit and defame its subject (Plaintiff) and was published with an enormous degree of fault, the wanton negligence to defame, and the malicious intent to defame, and is greatly damaging to Plaintiff.

10.  The entire ARTICLE ONE, subject to minor fact bits is utterly false (and said minor fact bits are deceptively arranged to support several false conclusions made by Defendants throughout), and Plaintiff claims that the entire ARTICLE ONE underpins defamation to Plaintiff.

11 (a).  The entire reference/allusion to Plaintiff in ARTICLE TWO is utterly false, deceptive, misleading, and defamatory toward Plaintiff. The relevant "EXCERPT" of ARTICLE TWO reads as follows:

> *"He* [Major Lamar] *helped convict a man* [Plaintiff] *who was offering costumes on eBay, collecting money, but never shipped any out."*

In this EXCERPT of Defendants' ARTICLE TWO, Defendants use an utterly false statement to defame Plaintiff, and they do so without quotation to a source. They proffer this EXCERPT as an express fact, but without doing any of the minimal research required to even begin to draw a

conclusion. For if any of said minimal research was performed, the obvious falsity of the EXCERPT would be lucid. But Defendants ignore the truth and/or are aware of it but refused to publish it, and instead chose to defame Plaintiff with a fortification of falsities, in an effort to bulwark their 'business relationship' with Homeland Security, to increase ad revenues, and to increase business-to-business and business-to-consumer business via their publication by weakening business on the internet through fear tactics derived from false information.

11 (b).   Further, Major Lamar, in person to Plaintiff, has wholly denied giving Defendants any information whatsoever that could've led them to the defamatory conclusion they make in their EXCERPT [aforementioned in paragraph 11 (a)] and Major Lamar wholly denied the EXCERPT's proffered statement of fact that Plaintiff never shipped any costumes out.

11 (c).   The actual fact: that Plaintiff did in fact ship costumes to his customers is **100% indisputable** (Plaintiff showed up at various Post Offices all over New England for years with carloads of boxes -- most postal workers were on a first-name basis with Plaintiff and would be stunned if he missed a shipment interval -- and dozens of people made these trips to the Post Office on Plaintiff's behalf to ship costumes as well, and Plaintiff bought postal delivery confirmations for many shipments too), and Defendants are or should be fully aware of this without even doing minimal research, as their ARTICLE ONE, printed a few weeks earlier states

> *"Ms. Mello ... had even helped him* [Plaintiff] *ship them* [costumes] *out a few days a week. Another woman had helped Mr. Ligeri ship them before, she said."*

Further, since ARTICLE ONE states that Plaintiff did have costumes shipped to his customers and ARTICLE TWO states that Plaintiff "never" shipped any out, one of the Articles is indisputably using false information to defame Plaintiff. Plaintiff, however, additionally alleges that both ARTICLE ONE and ARTICLE TWO are using false information to defame Plaintiff.

12 (a).  The very nature of the falsehoods and deception in ARTICLE ONE heavily infer an intent to defame and utterly nullify the concept of any type of "inadvertent mistake" defense that could be lodged by Defendants.

12 (b).  The very nature of the falsehoods and deception in ARTICLE TWO utterly infer an intent to defame and prove intent to proffer false information about Plaintiff to achieve their objectives for the Articles.

13.  Plaintiff claims that Defendants failed to do minimal journalistic research and follow the most bare bones meager journalistic procedures prior to publishing Articles of such weighty vilification--toward Plaintiff. For instance, Defendants made no attempts to contact Plaintiff to get his side of the story before publishing an article that defamed his entire business reputation and character and labeled him--without reference to a source or without noting the reference as an opinion--a "scammer" (a term that is proffered as the opinion of Defendants, based on not even a meager investigation prior to the cataclysmic defamation printed and broadcast all over the world; and it is the Plaintiff's allegation that such a meager investigation was intentionally not performed, where it is already undeniable that it was wantonly negligently not performed). Not only did Defendants not contact the Plaintiff prior to their grand defamation of him, but they also refused to communicate with Plaintiff at all, post the article's release. Additionally, Defendants did not contact any of the alleged victims of the alleged "scamming" they conclude to have factually occurred.

14 (a).  Further, even if, and where, the facts in Defendants' Articles were, or are, in fact true, the conclusions made on them are still so false and deceptive as to still constitute severe defamation. For example, the second paragraph of ARTICLE ONE states that dozens of eBay users paid for a costume from Plaintiff which Plaintiff never delivered, and states that they were

"scammed" by Plaintiff (additionally, without even quoting a source, Defendants conclude these "customers" were scammed -- without speaking to either the alleged scammed or the alleged scammer, nor quoting a third party which would still be unlawfully inadequate, if done, but simply went ahead and condemned Plaintiff in the public eye as a: "scammer").

14 (b). Continuing from Paragraph 14 (a), since Plaintiff has in fact shipped costumes to approximately **40,000** costumers during his tenure doing business on eBay, even if it were in fact true that he did not deliver a few dozen costumes, that would still not be a fact that would prove or even create an inference as to Plaintiff being a "Scammer" but would rather prove beyond a shadow of a doubt that Plaintiff was one of the most responsible businessmen in the world, with a failure ratio of one out of almost two thousand. Not the statistics of a scammer, but rather the statistics of a practically infallible businessman. But Defendants framed everything in their Articles in the most false, defamatory, misleading, and fraudulent manner possible, even when referencing scant bits and parcels of truth.

14(c). Continuing from Paragraph 14(b), an example of Defendants' use of a 'morsel' of truth (though scant and completely irrelevant) only to homogenize the false and defamatory "scammer" tone they vilify Plaintiff with throughout ARTICLE ONE, can be found in paragraph five of ARTICLE ONE, wherein it states:

> "*Mr. Ligeri didn't actually make any of the costumes. He bought them from a wholesaler and sold them, sometimes with markups as high as 60 percent.*"

A non-deceptive way of saying this would have been "Mr. Ligeri was a retailer."

15. As stated above, Plaintiff deems the entire ARTICLE ONE false and defamatory and reserves the right, when and if called upon (and if deemed necessary by this court) to refute each and every falsehood individually, but for the purposes of this lawsuit, will refute just a few

falsehoods for exemplary purposes, such as the ones aforementioned and following in this complaint.

16. Defendants' ARTICLE ONE opens with

*"Looking for a last-minute Halloween costume? Be careful whom you buy from"*, suggesting that the Defendants' are going to provide some pointers on how to be more careful when shopping on eBay, but the Defendants don't, they strictly defame Plaintiff (a **FORMER** eBay seller) and offer no advice on how to "be careful whom you buy from". Further, eBay's CUSTOMER FEEDBACK system, discussed at greater length below in this complaint, already gives customers the best method of being careful and eBay also allows them to insure their purchases to make their shopping effectually 100% risk free. So, not only do Defendants offer no advice on how to be more careful when shopping on eBay, there is no advice that *could* be offered, because eBay already has the best conceivable system for that. Regardless, Defendants don't even make an attempt, they strictly defame Plaintiff a multitude of times in order to increase ad revenues, as expanded on below in this complaint.

17. ARTICLE ONE's second paragraph ends with

*"The hottest-selling outfit in the hustle? A deluxe Darth Vader outfit that fetched as much as $900."*

This false statement serves to bulwark the concept of "big volume scam happening!!" and pave the way for a series of defamatory statements against Plaintiff. One needs no proof to conclude the falsity in this excerpt, but proof is available. The reason no proof is needed is because it's obviously false on its face. The hottest-selling costume couldn't be one that most people couldn't afford nor dream of spending on a Halloween costume, and the hottest-selling costume was in fact a 'mini-Darth Vader' costume that cost $30 -- much closer to the amount that most people

spend on their Halloween costumes, if that.

18. The sixth paragraph of Defendants' ARTICLE ONE states, in part,

> *"...Mr Ligeri never used his own name or information -- allow*[ing] *him to avoid detection..."*

This a comprehensive falsehood that serves to substantially bulwark the rest of said article's falsehoods. And it does so in the following way: If Defendants had stated the truth,, that Mr. Ligeri (Plaintiff) had and does in fact use his own name, and is known coast to coast, by his real name (Justin Ligeri) all over the costume industry, from trade shows to the homes of his happy consumers, than much of the rest of the lies in Defendant's article would look quite contradictory. A journalist, who exercised the tiniest amount of reasonable due diligence in researching prior to publication of the defamatory ARTICLE ONE, would've found out that Plaintiff has a Costume Corporation **in his name,,** is present at industry trade shows all over the United States, as himself, and personally handled phone calls and emails to his eBay customers, as himself (emails from a CompuServe address registered in his name) and is reached in the costume industry by way of an email containing his name in the actual email:

'JLigeri2005@yahoo.com', and his full name in the body of the email, not exactly the "MO" of someone trying to elude authorities, as Defendants also falsely conclude in ARTICLE ONE. And Plaintiff has lived at the same address in Rehoboth for most of his adult life. But Defendants make Plaintiff out to be one of the mysterious eluders of an Unsolved Mysteries program. This factual information completely overturns the idea that Plaintiff is trying to avoid detection, but rather supports and confirms the idea that Plaintiff is looking to be detected everywhere he goes to increase his business and consumer base. Further, Plaintiff also had an eBay business in his own name, which is more information that Defendants refused to include in their article and/or to

Case 1:07-cv-10528-WGY   Document 1   Filed 03/19/07   Page 9 of 15

circumstances. But the statement is just thrown in there with just the right amount of minimal wording to make it false and defamatory. Any less wording wouldn't constitute a statement, any more would reveal its falsehoods. The statement aims to state the following: that Ms. Escobar was scammed by Plaintiff in such a detrimental way that her only recourse for rehabilitation and safe haven, in her distraught mind, was to move to the vast state of Texas to 'start over.' As if to say that she was so distraught that she couldn't think clear enough to realize that Texas would offer her no more protection than the Commonwealth of Massachusetts, but under the duress of such "scamming", she couldn't think, so she just impulsively picked the biggest and southernmost state. The ARTICLE gives no more information than that. It leaves it up to the readers to try and fathom the detriment of this poor girl starting over in Texas, this "poor girl" who is in fact a close and affectionate former girlfriend of Plaintiff, who moved to Texas **because she was accepted into the college of her choice in Texas.** The statement that she moved to Texas as a result of being scammed in Massachusetts is so clearly a false concept on its face that any reasonable journalist would do a tiny bit of digging, and maybe even consult the Texas-absconder herself, or the person who allegedly put her in the zero option position of having to abscond to Texas, or her sweet parents, or Major Lamar who they only claim to quote throughout the article, or anybody with any knowledge of her situation whatsoever, and would've found that she had plans to attend college in Texas, was accepted, and went. And as much as Plaintiff would love to take credit for the positive educational choices of his former lovers, he had as much to do with her decision to move to Texas as The Alamo did. But this level of falsity and defamatory statements isn't surprising from a set of Defendants who state that Ms. Escobar lives in Swansea, when she lived with her parents in Seekonk for all of her life, and that the Plaintiff lives in Seekonk, MA, when he does and has lived in Rehoboth, MA, for substantially

all of his adult life. The truth is only used in Defendants' ARTICLE ONE, when it is both irrelevant and aids in Defendants' defamation of Plaintiff. For example, it is <u>true</u> that Ms. Escobar moved to Texas. But it is a truth that is only relevant to support a <u>defamatory falsehood</u> -- which was that she absconded due to being scammed by Plaintiff.

20. ARTICLE ONE also gives the strong impression that consumers need to "beware" when shopping from <u>unknowns</u> on eBay, a motivation Plaintiff alleges on Defendants as a RICO and conspiracy with large corporation sponsors as well as with Homeland Security. The reason this "beware of unknowns" is so fraudulently based is simple: eBay has an almost bulletproof system of ensuring that their shoppers are not scammed (CUSTOMER FEEDBACK as well as insurance). That's why they're doing so well and people shop so freely on eBay. Because a shopper can look at a merchant's feedback and see how many products he's sold and how many happy vs. unhappy customers he's had, something a customer can't even do with a land-based merchant. For instance, a shopper finds a product he wants on eBay, then looks at the merchant's feedback and sees that it's 99.9% and that the merchant has sold 1000 items. This tells the customer that this merchant did 1000 transactions and had 999 positive comments and one negative comment, and so the customer knows that his odds of getting scammed are, at most, one in a thousand. At most, meaning, the one situation of negative feedback was probably not a scam to begin with. And the customer can read this one negative comment and find out exactly what the customer complained about. It could be something like "Buyer shipped a day late." Now the customer knows that the one negative comment was from a "complainer," not a scammed customer, and so he knows the merchant is sound. Likewise, if an eBay shopper sees that a merchant has a low Customer Feedback rating, that shopper could choose another merchant with a high Customer Feedback rating. For these reasons, but not limited to these

reasons, the Defendants' core motivation at the onset and in the raw concept of their articles was to deceive and misrepresent to their readers, and in this case, at the expense of defaming the Plaintiff to reach their fraudulent goals.

21 (a). ALLEGATION ON DEFENDANT'S MOTIVATION TO DEFAME PLAINTIFF (TO INCREASE PROFITS):

Continuing from the above paragraph, since every instance of a customer not receiving a product is documented by the dissatisfied eBay customer using eBay's universally trusted Customer Feedback system, why then would Defendants print an article (ARTICLE ONE) warning consumers to: *"be careful whom you buy from* [on eBay]," and offer NO system for, or advice on, being careful whom you buy from, nor mention at all the near infallible Customer Feedback system that eBay already has in place or how to use it, nor mention a better way for consumers to protect themselves, nor mention or allude to any way whatsoever that would consummate ARTICLE ONE's heading and purported direction, but only use false statements and deceptive allusions that defame Plaintiff, if not for a fraudulent motive? Plaintiff alleges that said actions of Defendants were done in support of a fraudulent motive, including, but not limited to, the following: to increase ad revenues, by vilifying online commerce and/or small business owners. And Defendants gain the needed exposure to increase ad revenues through their defamation of Plaintiff, by printing an article with big "catch phrases" like 'Homeland Security,' 'eBay,' 'scam,' and 'Beware' and 'Halloween."

21 (b). Defendants' Articles are so false and defamatory that they had to be intentional, or, the only other possible defense would be consummate indolence coupled with biblical-level coincidence.

21 (c). Defendants' mention in their Articles that Plaintiff didn't deliver his costumes,

that he set up eBay accounts in order to swindle. If Defendants were to print the truth about Plaintiff, that Plaintiff had one of the highest CUSTOMER FEEDBACK ratings on eBay, readers of Defendants' publications might not trust Defendants' publications anymore. Plaintiff claims that for those such reasons, Defendants left out the truth, because putting the truth in the Articles, where it mattered, would facially negate the rest of the content in the Articles, and Defendants would thereby undoubtedly lose paying subscribers and ad revenues. So, by leaving out the truth and defaming Plaintiff, Defendants were able to release a hot article, increase ad and subscription revenues, and prevent the loss of paying subscribers due to facial falsehoods. Therefore, Defendants made a deliberate choice to defame Plaintiff to increase revenues.

22. Defendants state, in ARTICLE ONE, that Plaintiff would meet with an army major, one Major Lamar (of Homeland Security), to ship costumes [in fact: to the small percentage of customers who were deprived through either Plaintiff's business insolvency or other common business omission typical to volume retailing], and Defendants state that Plaintiff missed three of these such meetings. Said article's statement: *"Mr. Ligeri missed three meetings..."* is entirely false and defamatory. Besides the fact that it is unlawful for military personnel to collect for private companies and use military might to force insolvent businessmen to scrounge together money to pay business debts, Plaintiff never missed any of these "meetings". Phone and email records prove that Plaintiff made regular attempts to contact Major Lamar because of the hanging threats on Plaintiff made by Major Lamar, but Major Lamar either did not return Plaintiff's calls or emails, or tersely responded to continuously postpone the meetings, which he did several times.

23. Plaintiff reserves the right to add as additional defendants in this complaint, Major Lamar, or any other persons, if any, Defendants claim they relied on for any and all information

in their Articles, specifically if Defendants claim they relied on any information of said presently unnamed persons. Presently, Major Lamar is not a party to this lawsuit only because Plaintiff is under the impression that Major Lamar denies making the [defamatory] statements that Defendants quote him as making. When initially asked by Plaintiff about ARTICLE ONE, Major Lamar, in his characteristic elusive brevity, responded about Defendants' publication by calling Defendants "wild" as if to be in the same shock as Plaintiff over the lies printed. (So it also stands to weigh in as highly unlikely that Defendants were able to find Lamar an effusive speaker brimming with personal opinions as well -- as they quote him as so being). Later, in an in-person meeting with Plaintiff, Major Lamar, when asked by Plaintiff if he in fact made the statements Defendants quote him as making, Major Lamar denied having done so. But until this court knows for sure where Major Lamar stands, whether he admits or denies making the comments to Defendants which Defendants printed and which were mostly false and effected additional defamation to Plaintiff, Plaintiff reserves the right to add Lamar as party to the defamation of Plaintiff printed in Defendants' Articles. Until then, Plaintiff proceeds herein this Complaint as if Major Lamar denies making the statements Defendants quote him as making, on the grounds that Major Lamar denied making the statements.

## PRAYER FOR RELIEF

Plaintiff requests this court for the following relief:

A judgment against defendants for:

a. $150,000 in damages, such as damage to reputation, lost wages, inconvenience, the loss of capacity for the enjoyment of life, and the loss of trade marketability due to Defendants' defamation of Plaintiff;

b. $500,000 in exemplary damages for Defendants' reckless (and/or intentional)

falsification and defamation of Plaintiff and/or complete disregard for facts and the other motivations alleged in this complaint;

    c.  Restitution and/or Disgorgement of Profits Defendants accrued by and through their defamatory statements towards Plaintiff.

    d.  Prejudgment interest, attorney's fees, costs of suit, including any expert witnesses;

    e.  Such other and further legal and equitable relief, as this Court may deem proper.

Respectfully submitted,

THIS _____ day of _____, 2007

BY: _____

Justin Ligeri
39 Wheaton Ave.
Rehoboth, MA 02769
(401) 952-2581

* * *